IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| KO OLINA DEVELOPMENT, LLC, )<br>a Delaware limited liability company, )<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>CENTEX HOMES, a Nevada general )<br>partnership, JOHN DOES 1-20; )<br>JANE DOES 1-20; DOE )<br>CORPORATIONS and OTHER )<br>ENTITIES 1-20, )<br>)<br>Defendants. )<br>_____ ) | CIV. NO. 09-00272 DAE-LEK |

ORDER: (1) GRANTING IN PART AND DENYING IN PART WITHOUT
PREJUDICE CENTEX'S MOTION FOR SUMMARY JUDGMENT; (2)
DENYING WITHOUT PREJUDICE KOD'S FIRST MOTION FOR PARTIAL
SUMMARY JUDGMENT; (3) DENYING KOD'S SECOND MOTION FOR
PARTIAL SUMMARY JUDGMENT; AND (4) DENYING WITHOUT
PREJUDICE KOD'S THIRD MOTION FOR SUMMARY JUDGMENT

Pursuant to Local Rule 7.2(d), the Court finds this matter suitable for

disposition without a hearing.  After reviewing Centex and KOD's motions and the

supporting and opposing memoranda, the Court: (1) **GRANTS IN PART AND**

**DENIES IN PART WITHOUT PREJUDICE** Centex's Motion for Summary

Judgment (Doc. # 170); (2) **DENIES WITHOUT PREJUDICE** KOD'S First

Motion for Partial Summary Judgment (Doc. # 163); (3) **DENIES** KOD'S Second

Motion for Partial Summary Judgment (Doc. # 165); and (4) **DENIES WITHOUT**

**PREJUDICE** KOD'S Third Motion for Partial Summary Judgment (Doc. # 167).

<u>BACKGROUND</u>

On December 23, 2004, Plaintiff Ko Olina Development, LLC

("KOD") and its affiliates entered into a purchase and sale agreement ("PSA") with

Defendant Centex Homes ("Centex") to sell a parcel of land known as Ko Olina

Resort Parcel 53 to Centex.  The land was sold for the development of a low-rise

condominium building and a residential condominium tower with improvements

and amenities (the "Condominium Project" or "Beach Villas").  (Doc. # 87 ¶ 9.)

The sale was conducted as a two-part transaction, with Parcel 53D transferred first

and Parcel 53A transferred second.  (<u>Id.</u> ¶ 8.)  The Beach Villas includes six

commercial units, denominated as CA-1, CA-2, CA-3, CA-4, CA-B, and CA-C

(collectively, the "Commercial Apartments").  (<u>Id.</u> ¶ 10.)

In connection with the sale of the land, KOD and Centex entered into

several contracts.  The time line and existence of these contracts are undisputed.

On September 1, 2005, the parties signed a Right of First Refusal, Purchase

Option, Agreement to Lease (the "Right of First Refusal").  (Doc. # 87 Ex. A.).

Under the Right of First Refusal, the parties agreed that "no sale, lease or transfer

of a KOD Commercial Apartment may be effected unless and until KOD shall have been offered the opportunity to purchase or lease the same . . . and shall have elected not to do so" under certain terms and conditions.  (Id. ¶ 1.)  This Right of First Refusal was effective against CA-1 and CA-3 only.  (Id. ¶ C.)  Several declarations and amended declarations of condominium property regimes were subsequently filed with the Land Court of the State of Hawai`i.  On April 11, 2007, Centex filed an Amended and Restated Declaration of Condominium Property Regime of Beach Villas at Ko Olina, and Condominium map, dated March 7, 2007, with the Land Court (the "Condominium Declaration").  (Doc. # 87 ¶ 40.)  The parties then executed a First Amendment to the Right of First Refusal on December 13, 2007 (the "First Amendment"), (Doc. # 87 Ex. B), and a Second Amendment on September 12, 2008 (the "Second Amendment"), (Doc. # 87 Ex. C).  The First Amendment was effective against CA-1, CA-2, and CA-3.  (Doc. # 87 Ex. B ¶ 1.) The Second Amendment was effective against CA-1, CA-2, CA-3, CA-B, and CA-C.  (Doc. # 87 Ex. C ¶ 1.)  The First and Second Amendments added two new provisions, Section 16 and Section 17, particularly applicable to disposition of the instant motions as will be discussed herein.

Prior to execution of the First and Second Amendments, on or about September 29, 2006, KOD and Centex had apparently presented a letter of intent to Ritz-Carlton to operate a luxury residential condominium on Parcel 54.  (Doc. # 87 ¶¶ 19-23.)  According to KOD, Centex subsequently "broke off negotiations" with Ritz-Carlton to create its own luxury brand.  (Id. ¶ 21.)  Centex allegedly abandoned its plans on or about June 2007, and sought to reopen negotiations with KOD and Ritz-Carlton.  KOD claims that Centex later again "walked away" from the deal, and further negotiations between KOD and Centex were unsuccessful.

On October 16, 2009, KOD filed a Second Amended Complaint ("SAC").  (Doc. # 87.)  The gravamen of the SAC pertains to certain easements appurtenant to the Commercial Apartments, described as limited common elements ("limited common elements" or "LCE"), and exclusive rights to control the LCE. KOD alleges that in negotiating and executing the First and Second Amendments, the parties understood that the Commercial Apartments included the appurtenant easements.  (Id. ¶ 37.)  The LCE include such areas as the recreational facilities, housekeeping facilities, pools, sidewalks, and other commercial areas.  KOD claims that ownership of the LCE transfer automatically with transfer of the Commercial Apartments.  KOD charges Centex with "attempting to change the character of the KOD Commercial Apartments in a manner contrary to what was

4

promised to KOD under the [Right of First Refusal] and the Option Agreements

[First and Second Amendments]."  (Id. ¶ 47.)  KOD believes that Centex is doing

so in order to placate a group of residential apartment owners who have threatened

to sue Centex.  (Id.)

KOD believes that Centex is considering or is already in the process

of severing the LCE easements appurtenant to the Commercial Apartments in one

of two ways.  One, by converting the LCE into common elements to be controlled

by the Association of Apartment Owners of the Beach Villas ("AOAO"), or two,

by amending the Condominium Declaration to materially alter the uses that may be

made of the Commercial Apartments.  (Id. ¶ 49.)  In furtherance of this action,

Centex has purportedly "caused the [AOAO] to vote to sever the easements

appurtenant to the KOD Commercial Apartments by Amending the Condominium

Declaration to re-characterize those easements appurtenant to the KOD

Commercial Apartments from LCEs to Common Elements."  (Id. ¶ 50.)

Count I of the SAC seeks declaratory relief in the form of court order

saying that the Commercial Apartments include appurtenant easements, that KOD

has the right to purchase the Commercial Apartments as specified, and that those

apartments include the appurtenant easements.  (Id. ¶¶ 52-54.)  KOD asks the

Court to find that Centex must transfer the easements attached to CA-1 and CA-3

5

on September 1, 2005, attached to CA-2 on December 13, 2007, and CA-B and

CA-C on September 12, 2008, in accordance with the Right of First Refusal as

amended.  (Id. ¶ 54(b).)

Count II of the SAC seeks declaratory relief in the form of a court

order stating that Sections 16 and 17 created option contracts granting KOD certain

rights.  KOD requests this Court order that KOD has the right to purchase the

Commercial Apartments as specified in the First and Second Amendments, that the

LCE were included in the Commercial Apartments on the dates the Amendments

were executed, and that Centex is precluded from acting in derogation of the

Amendments.  (Id. ¶ 58.)

Count III is a promissory estoppel claim, which alleges that Centex

knew or should have reasonably known that representations made orally and in

writing would induce Plaintiff to enter into the Right of First Refusal and convey

Parcel 53D to Centex.  (Id. ¶ 61.)  Count IV alleges breach of the duty of good

faith and fair dealing by Centex in performing the Right of First Refusal and

Amendments.  (Id. ¶¶ 68-69.)

There are several motions pending before the Court to be addressed

herein.  KOD filed three separate motions for partial summary judgment relating to

whether KOD is entitled to an option in the LCE: (1) the First and Second

Amendments demonstrate KOD has an option in the LCE (the "First Motion"); (2) Section 3B of the Restrictive Covenant demonstrates that KOD has an option in the LCE (the "Second Motion"); and (3) KOD has the right to purchase the Commercial Apartments and their LCE without any terms, conditions, or restrictions that alter the nature or uses of the Commercial Apartments and appurtenant LCE.  (Docs. ## 163, 165, 167.)  Centex has also filed a motion for summary judgment.  (Doc. # 167.)

Centex filed three Oppositions to KOD's motions.  (Docs. ## 221, 219, 222.)  KOD filed three Replies in support of its motions.  (Docs. ## 238, 240, 242.)  KOD filed an Opposition to Centex's motion, (Doc. # 226), and Centex filed a Reply in support of its motion, (Doc. # 237).

<u>STANDARD OF REVIEW</u>

Rule 56 requires summary judgment to be granted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); <u>see</u> <u>also</u> <u>Porter v. Cal. Dep't of Corr.</u>, 419 F.3d 885, 891 (9th Cir. 2005); <u>Addisu v. Fred Meyer, Inc.</u>, 198 F.3d 1130, 1134 (9th Cir. 2000).  A main purpose of summary judgment is to dispose of

factually unsupported claims and defenses.  Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).

Summary judgment must be granted against a party that fails to demonstrate facts to establish what will be an essential element at trial.  See id. at 323.  The burden initially falls upon the moving party to identify for the court those "portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact."  T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987) (citing Celotex Corp., 477 U.S. at 323).

Once the moving party has carried its burden under Rule 56, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial" and may not rely on the mere allegations in the pleadings.  Porter, 419 F.3d at 891 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)).  "[A]t least some 'significant probative evidence'" must be produced.  T.W. Elec. Serv., 809 F.2d at 630 (quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 290 (1968)).  "A scintilla of evidence or evidence that is merely colorable or not significantly probative does not present a genuine issue of material fact."  Addisu, 198 F.3d at 1134.

When "direct evidence" produced by the moving party conflicts with "direct evidence" produced by the party opposing summary judgment, "the judge

must assume the truth of the evidence set forth by the nonmoving party with respect to that fact." T.W. Elec. Serv., 809 F.2d at 631.  In other words, evidence and inferences must be construed in the light most favorable to the nonmoving party. Porter, 419 F.3d at 891.  The court does not make credibility determinations or weigh conflicting evidence at the summary judgment stage. Id.; see also Nelson v. City of Davis, 571 F.3d 924 (9th Cir. 2009) ("[C]redibility determinations, the weighing of the evidence, and the drawing of legitimate infrerences from the facts are jury functions, not those of a judge.") (citations omitted).  However, inferences may be drawn from underlying facts not in dispute, as well as from disputed facts that the judge is required to resolve in favor of the nonmoving party. T.W. Elec. Serv., 809 F.2d at 631.

DISCUSSION

It is undisputed that KOD retains a right of first refusal, as is the existence of certain contracts and the fact that certain limited common elements are appurtenant to certain Commercial Apartments.  The primary point of contention is whether KOD's rights to the Commercial Apartments includes rights to the LCE as "part and parcel" to the Commercial Apartments.  This Court's review is limited to the express terms of the contracts and declarations, unless an ambiguity exists in

9

the contract terms.  See Amfac, Inc. v. Waikiki Beachcomber Inv. Co., 74 Haw. 85,

124-35 (1992).

It is difficult to discern whether the parties themselves contend that

the various contracts and declarations are ambiguous.  Despite arguing that the

plain contract terms clearly support their respective positions, both parties submit

voluminous documentation of extrinsic evidence to bolster their interpretations of

the contract terms and the parties' purported intent.  This extrinsic evidence

includes emails, letters, affidavits attesting to what various individuals thought or

intended at the time the contracts were executed or contemplated, as well as

documentation of other draft agreements.  Both parties seemingly switch their

position as to whether genuine issues exist, and on what extrinsic evidence they

wish the Court to rely, depending on what memorandum the Court reviews.

Nevertheless, the Court has conducted its own analysis of the terms of the contracts

and declarations to ascertain whether the terms are ambiguous and whether genuine

issues of material fact exist.

For reasons set forth below, the Court concludes that the Declaration

of Covenants agreed to by the parties does not limit Centex's ability to

recharacterize the limited common elements as common elements, but that genuine

issues of material fact exist as to whether the Right of First Refusal includes the

limited common elements.  Because the Court must withhold judgment on whether

the Right of First Refusal, as amended, includes the LCE, it is premature for the

Court to rule on the various other ancillary issues included in the parties'

respective motions.

I.      Hawai`i Condominium Law

            The Court will first address KOD's contention that the LCE must

necessarily be transferred along with the Commercial Apartments as appurtenant

easements pursuant to basic property law principles.  (KOD First Mot. at 26.)

            As KOD notes, "the purchaser of the property takes it subject to

existing easements."  Hemni Apartments, Inc. v. Sawyer, 3 Haw. App. 555, 562

(Haw. App. Ct. 1982).  Although generally a correct statement of law, this

principle is not necessarily controlling in this instance.  This is not a property

exchange as might be evaluated solely under traditional common law principles.

The State of Hawai`i has a detailed and controlling condominium statutory scheme.

See Lee v. Puamana Cmty. Ass'n, 109 Hawai`i 561, 575 (2006) ("[C]ondominium

property regimes are creatures of statute.").  In what is essentially a dispute over

condominium rights, the Court must evaluate the facts in light of HRS Chapter 514B.[1]  See Haw. Rev. Stat. §§ 514B-1 to -163.

Hawai`i Revised Statutes sections 514B-39 and -40 inform the Court's analysis of what Centex is permitted by law to do with the limited common elements.  Section 514B-39 states:

> If the declaration designates any portion of the common elements as limited common elements, those limited common elements shall be subject to the exclusive use of the owner or owners of the unit or units to which they are appurtenant, subject to the provisions of the declaration and bylaws.  No amendment of the declaration affecting any of the limited common elements shall be effective without the consent of the owner or owners of the unit or units to which the limited common elements are appurtenant.

Haw. Rev. Stat. § 514B-39.[2]  Any owner's "exclusive use" of an appurtenant common element is subject to the provisions of the declaration and bylaws.  As is discussed below, Article XXIII of the Condominium Declaration expressly reserves to Centex the power to recharacterize the limited common elements. (Centex Opp'n CSOF Ex. K at 44.)

---

[1] As discussed elsewhere in this Order, the relevant portions of Chapter 514B substantially mirror the comparable portions of Chapter 514A.

[2] The Court notes similar consent language set forth in HRS § 514A-13 (repealed July 1, 2006).

HRS § 514B-40 provides for transfer of limited common elements. "Except as provided in the declaration, any unit owner may transfer or exchange a [LCE] that is assigned to the owner's unit to another unit.  Any transfer shall be executed and recorded as an amendment to the declaration."  Haw. Rev. Stat. § 514B-40.  Insofar as the statute provides, there is no express statutory limitation on the right to recharacterize the LCE.  To the contrary, it appears that under Chapter 514B, an owner has broad authority to transfer or recharacterize, subject to the condominium declaration and bylaws.

The Supreme Court of Hawai`i has held that an amendment to a declaration may convert common elements to limited common elements.  In Penney v. Ass'n of Apartment Owners of Hale Kaanapali, the court found that when a common element is converted to a limited common element, "the benefit to all the apartment owners is significantly diminished."  70 Haw. 469, 470 (1989). Nevertheless, the court did not find that the conversion was a violation of the owners' property interests per se.  Instead, the court determined that such a conversion would require the consent of all the owners, pursuant to the statute in place at that time.  Id. (citing Haw. Rev. Stat. § 514A-13(b) (repealed July 1, 2006).)

13

Following this reasoning and applying it conversely, Centex may convert limited common elements to common elements so long as Centex complies with the condominium statute and the terms of the Condominium Declaration. Even applying the statutory requirement for consent of owners, KOD merely has a right of first refusal to the Commercial Apartments and is not currently an "owner" under the statute.  KOD is not the owner of the unit until KOD has exercised its right to purchase.  See 25 Williston on Contracts § 67:85 (4th ed. 2002). Therefore, in reviewing only the strict terms of the statute in conjunction with the Condominium Declaration, Centex is not obligated to receive approval from KOD prior to recharacterizing the LCE.

KOD maintains, however, that Centex cannot exercise its rights under the Condominium Declaration without violating its independent contractual obligations arising from the Right of First Refusal.  Before evaluating whether the Right of First Refusal would in fact be violated should Centex recharacterize the LCE, the Court must determine what rights are actually granted to KOD in the Right of First Refusal.

14

II.   <u>Whether KOD's Right of First Refusal Includes the Limited Common Elements</u>

In KOD's First Motion, KOD asserts that the "parties have always understood and intended that KOD or its affiliates would have the right to control all of the Commercial Apartments and appurtenant LCEs that are at issue in this litigation." (KOD First Mot. at 2.)  KOD moves this Court to declare: (1) that the Right of First Refusal, as amended, is a binding and effective agreement providing KOD the right to purchase the Commercial Apartments; (2) that the Commercial Apartments include those appurtenant easements referred to as LCE on the date the Right of First Refusal and Amendments were executed; and (3) that Centex is precluded from taking any action to sever the LCE from the Commercial Apartments without KOD's consent.  (<u>Id.</u>)  KOD contends that the plain language of Sections 16 and 17 of the Right of First Refusal (as incorporated by the First and Second Amendments) create two separate option contracts obligating Centex to transfer the Commercial Apartments to KOD as they existed on the dates the agreements were executed, with the LCE.[3]  (<u>Id.</u> at 3.)

---

[3] KOD further argues that KOD had agreed to defer its right to purchase in reliance on promises by Centex that KOD would be able to exercise its right in the future.  (<u>Id.</u> at 3.)  Centex has purportedly "reneged on its obligations" to "avoid a threatened lawsuit" and will recharacterize the LCE associated with the CA-2 Commercial Apartment as common elements.  Recharacterizing the LCE as

(continued...)

Centex does not dispute the existence of the contracts or the terms, but does dispute the inferences and conclusions that KOD draws from them.

A.   <u>The Purchase Sale Agreement</u>

KOD first relies on the Purchase Sale Agreement ("PSA") to demonstrate the parties' alleged intent to transfer the LCE with the Commercial Apartments.  (KOD Mot CSOF Ex. 2.)  KOD states that the PSA included an option for the LCE.  (KOD Mot. CSOF ¶ 8.)

The plain terms of the PSA do not support KOD's contention. Section 7A(A) provides that Centex may design condominium apartments, shall specify the intended uses, and shall indicate whether the units were to be made subject to certain restrictions set forth in Section 3(B)(1).  (KOD Mot. CSOF Ex. 2 at 12.)  Section 3(B)(1) states:

> [Centex] may not use the Property [Parcel 53] for any commercial or retail purposes unless the same are either (i) incidental to the condominium uses of the Property (i.e., designed to service only owners or guests thereof and not generally open to the public), (ii) operated in the commercial condominium units sold to Seller pursuant to Section 7(D) hereof, or (iii) approved in writing by KOD.

---

[3](...continued)
common elements would eliminate the easements in those areas, which KOD contends to have a real property interest in, and cede control of those "common elements" to the AOAO.  (KOD First Mot. at 3.)

(Id. at 5.)  There is no specific mention of LCE in these contract terms, nor any

language that can reasonably be interpreted to refer to rights to the LCE.  This

section limits only Centex's ability to use Parcel 53 for commercial or retail

purposes.  As such, the terms are clear, and the PSA does not furnish contractual

evidence that the parties agreed to grant KOD an option in the LCE.[4]

> B.    Right of First Refusal

> The pertinent portion of the Right of First Refusal provides:

[Centex] agrees that no sale, lease or transfer of a KOD Commercial
Apartment may be effected unless and until KOD shall have been
offered the opportunity to purchase or lease the same, as applicable,
and shall have elected not to do so, on the following terms and
conditions ("Section 1").

(Am. Compl. Ex. A ¶ 1.)  The terms of this provision references only KOD's right

to purchase the "Commercial Apartment."

> On December 13, 2007, the parties agreed to the First Amendment to

the Right of First Refusal, and a new Section 16[5] was added to grant KOD an

---

[4] Centex argues that certain terms of the PSA have been effectively waived by KOD.  (Centex First Opp'n at 4.)  The Court need not reach this issue, because KOD's interpretation is not supported by the agreement's plain meaning.

[5] In opposition, Centex argues that Section 16 was rendered moot by adoption of Section 17.  The Court declines to reach this issue, as neither Section 16 nor Section 17 resolve the contractual ambiguity as to whether the limited common elements are transferred with the Commercial Apartment.

option to acquire Commercial Apartments CA-1, CA-2, and CA-3.  Section 16,

"Purchase Option" states as follows:

> Upon the fifth (5th) anniversary of the commencement of the term of the lease referred to in Section 2 hereof and for a period of ninety (90) days after KOD's receipt from Developer or its permitted successor of the applicable construction costs thereafter, KOD shall have the option to acquire . . . any of the KOD Commercial Apartments not theretofore acquired by KOD pursuant to Section 1 hereof . . . . .

(KOD Mot. CSOF Ex. 23 ¶ 4.)

The above-quoted provision grants KOD an option in the "KOD

Commercial Apartments."  These Commercial Apartments refer to units CA-1,

CA-2, and CA-3.  No reference is made as to whether the term "apartment"

incorporates the appurtenant limited common elements.

On September 12, 2008 , the parties agreed to the Second Amendment

to the Right of First Refusal, and a new Section 17 was added as to Commercial

Apartments CA-1, CA-2, CA-3, CA-B, and CA-C.  (KOD Mot. CSOF Ex. 27.)

Section 17 states, in part:

> Developer [Centex] covenants not to sell, transfer or otherwise convey . . . its interest in any of the KOD Commercial Apartments to any person or entity other than KOD or the AOAO for the Condominium Project ("AOAO") unless both KOD and the AOAO have been provided with the opportunity to purchase such KOD Commercial Apartment(s) and declined to do so.  Developer further covenants to KOD that Developer will present an offer to the AOAO for the AOAO to purchase the KOD Commercial Apartments containing a

purchase price of $1 . . . .  The AOAO offer will trigger KOD's right
of first refusal as set forth in Section 1 of this Agreement and in
accordance with subsection 1(c) thereof.

(Id. ¶ 3.)  This language, again, makes no reference to the LCE.

The term " KOD Commercial Apartment" is used in the Right of First
Refusal seemingly to refer to the units themselves.  The units denominated CA-1
and CA-3 are "referred to individually as a 'KOD Commercial Apartment' and
collectively as the "KOD Commercial Apartments."  (Id. ¶ C.)

Exhibit A to the Right of First Refusal includes the property
description and a map depicting CA-1.  The unit is depicted in white, with the
surrounding limited common elements distinguished from the unit with shading.
(Id. at 33.)  It is not entirely clear from the map, however, whether the shading
indicates that the LCE are conveyed separately, or if they are conveyed together
with the apartment and the map simply indicates where the LCE are located.

Use of the term "Commercial Apartment" is similar in the First and
Second Amendments.  The recitals amended by the First Amendment refer to the
KOD Commercial Apartments as being composed of the three commercial units
denominated as CA-1, CA-2, and CA-3.  (Am. Compl. Ex. B. ¶ 1.)  Likewise, in
the Second Amendment, the "Commercial Apartments" are composed of five

commercial units, CA-1, CA-2, CA-3, CA-B, and CA-C.  (Am. Compl. Ex. C ¶ 1.)

There is no reference made to the appurtenant limited common areas.

        The documents lack of specific reference to LCE does not, however,

necessarily resolve the question of whether the term "apartment" was understood

by the parties to include the appurtenant easements.  KOD argues that basic

principles of property law require that the LCE are transferred along with

Commercial Apartments, and therefore it would have been superfluous to

specifically mention the LCE in the terms.  KOD cites to the Intermediate Court of

Appeals' holding in <u>Hemni Apartments</u>, wherein the court noted that appurtenant

easements are conveyed along with the dominant lots even if the instrument of

transfer does not state so explicitly.  3 Haw. App. at 561.

        The Court concludes that there is at least room for reasonable debate

as to whether the reference to "commercial apartment" would have included the

appurtenant easements.  The Court must look to extrinsic evidence in an attempt to

ascertain the parties' intent.

        In the Condominium Declaration, "Commercial Apartment" is defined

separately from the "common elements," and common elements are defined to

include the limited common elements.  (Centex Opp'n CSOF Ex. K at 5.)

"Limited common elements" are defined as "those Common Elements which are

20

designated . . . as reserved for the exclusive use of one or more Apartments to the exclusion of other Apartments." (Id. at 8.)  The LCE are therefore treated as entities separate from the Commercial Apartments.  The Court further notes that the First and Second Amendments were executed after the Condominium Declaration was filed by Centex.  KOD therefore had, at a minimum, constructive notice that the Condominium Declaration did not include the LCE with the Commercial Apartments.[6]

Moreover, the terms "common elements" and "limited common elements" are expressly defined in the applicable condominium laws, Hawaii Revised Statutes Chapter 514B.[7]  The statutory definitions of both terms clearly exclude the units themselves from the common elements.  "Common elements" is defined as "[a]ll portions of a condominium other than the units" and "[a]ny other

_____

[6] KOD argument that the subsequent Amendments "reaffirmed" that Centex's power to recharacterize the LCE had no applicability against KOD is circular, and presumes that the Court finds that the Right of First Refusal was to both the units and the LCE.  (KOD First Mot. at 18.)

[7] Chapter 514B was effective July 1, 2006, prior to filing of the Condominium Declaration.  The former condominium statute, Chapter 514A, was repealed effective July 1, 2006.  See Haw. Rev. Stat. §§ 514A-1 to -135 (repealed July 1, 2006).  The relevant terms, however, are substantially similar.  The Condominium Declaration provides that in any conflict of terms between the declaration and the statute, HRS Chapter 514B shall prevail.  (Centex Opp'n CSOF Ex. K at 3.)

interest in real estate for the benefit of unit owners that are subject to the declaration."[8]  Haw. Rev. Stat. § 514B-3 (emphasis added).  "Limited common element" is defined as "a portion of the common elements designated by the declaration or by operation of section 514B-35 for the exclusive use of one or more but fewer than all of the units."  Id.  The statute, therefore, defines the LCE as being part of the common elements, and not part of a "unit" that might be individually owned.  This extrinsic evidence seems to indicate that the only reasonable interpretation of "commercial apartment" would be that it does not include the LCE.

KOD argues, however, that if the Court looks to the Condominium Declaration and statute, then the Court must look to all extrinsic evidence to ascertain the parties' intent.  The Supreme Court of Hawai`i has "adopt[ed] the view allowing extrinsic evidence, i.e., all evidence outside of the writing including parol evidence, to be considered by the court to determine the true intent of the parties if there is any doubt or controversy as to the meaning of the language embodying their bargain."  Hokama v. Relinc Corp., 57 Haw. 470, 476 (1977); see

---

[8] The definition in Chapter 514A was not meaningfully different than this definition, as it listed the elements included in a common element and omitted mention of "units."  See Haw. Rev. Stat. § 514A-3 (repealed July 1, 2006).

In re Lock Revocable Living Trust, 109 Hawai`i 146, 152-53 (2005); Matter of
Ikuta's Estate, 64 Haw. 236, 244 (1981).

> The Court should therefore look to all extrinsic evidence.  Doing so,
however, only amplifies the confusion infusing this case, it does not alleviate it.

> C.    Genuine Issues of Fact as to the Parties' Intent

> Both parties submit extensive extrinsic and parol evidence to
demonstrate the parties' intent.  The Court recounts below those testimonies and
documents that are representative of what has been submitted.

> As evidence that the Right of First Refusal was intended to include
both the Commercial Apartments and the LCE despite only referring to
"Commercial Apartments," KOD relies primarily on testimony extrinsic to the
terms of the contract.  (E.g., KOD Mot. CSOF Ex. 39, 40; Stone Mot. Decl. ¶ 16.)
For instance, KOD asks this Court to find that the "parties understood and intended
that KOD's option included the appurtenant LCEs, as it was necessary for KOD to
control the LCEs in order to transfer that control to a luxury operator."  (KOD First
Mot. at 13.)

> KOD submits the deposition of Michael Kosmin, 2003-2006 Vice-
President of sales and marketing for Centex.  (KOD Mot. CSOF Ex. 40.)  Kosmin
attested to the fact that Centex management had discussed internally that Jeffrey

Stone, President and Director of Commercial Properties Advisors (which is the manager of KOD), had the ability to purchase commercial apartments and that the limited common elements "would go along" with the commercial apartments. (Kosmin KOD Mot. Dep. at 18:2-8 (emphasis added).[9])

Kosmin also stated that the negotiations with KOD were "[n]ot unlike other arrangement we have made where he [Jeffrey Stone] keeps limited common elements or commercial apartment units as part of the negotiation and has the right to exercise those as we move through the sales and marketing process."  (Id. at 7:9-13 (emphasis added).)  The statement itself is not conclusive, because Kosmin refers to limited common elements "or" commercial apartments.  One reasonable interpretation of this statement is that the limited common elements and commercial apartments may be negotiated separately.

Kosmin continues on to state that during negotiations, the parties discussed that the LCE would be "part and parcel of that option or right of first refusal that Mr. Stone was going to get."  (Kosmin KOD Mot. Dep. at 9:9-13.) There is more than one reasonable interpretation of this statement.  The statement maybe be read to merely demonstrate that including LCE in the right of first

---

[9] The Court notes that the page numbers appear to be out of order in the copy of the deposition as submitted to the Court.

refusal was discussed, not that it ultimately was included in the final contract agreed to by the parties.

Bruce Sloan, Centex President, testified somewhat ambiguously when questioned whether the Right of First Refusal included the limited common elements.  (KOD Mot. CSOF Ex. 39.)  Sloan testified that "limited common elements . . . are <u>included in the design</u> [of the condominium apartments]."[10] (Sloan KOD Mot. Dep. at 15:7-10 (emphasis added).)  When asked specifically whether the Right of First Refusal included the LCE, Sloan testified that the Right of First Refusal did not reference any LCE, and that he <u>could not answer</u> whether or not the Right of First Refusal included LCE.  (<u>Id.</u> at 13:3-10.)  Such dialogue is inconclusive.  Because the LCE are included in the design, KOD argues, the LCE are necessarily part of the Right of First Refusal in the Commercial Apartments. The Court, however, finds that reasonable parties could disagree as to whether that statement made by Sloan actually stands for the proposition KOD is asserting.

Jeffrey Stone states in his declaration that it was his understanding that the Right of First Refusal "was intended to include the limited common

---

[10] Sloan further acknowledged that the seller had the option to elect to purchase such commercial units.  (Sloan KOD Mot. Dep. at 15:11-16:5.)  It is a legal conclusion, however, whether the option to purchase such commercial units included the option to purchase the LCE.  (<u>Id.</u> at 16:3-4.)

elements that were appurtenant to the Commercial Apartments as exclusive

easements."  (Stone KOD Mot. Decl. ¶ 16.)  He further stated that it was his

understanding that the Right of First Refusal "was not subject to Article XXIII of

the Condominium Declaration."  (Id.)

        KOD also relies on certain letter and email correspondence between

various individuals to demonstrate intent.  For example, in a letter from Jeffrey

Stone to Bruce Sloan, Stone offered to forego KOD's right to exercise its option on

CA-B and CA-C in exchange for Centex's agreement to designate certain

improvements to certain spaces as limited common elements to CA-B or CA-2.

(KOD CSOF Ex. 24 at 2.)

        In an email dated May 23, 2008 from Stone to Sloan, Stone

emphasized KOD's interest in control over the commercial spaces of the Project.

Sloan stated:

> [W]e have always had a right to control the commercial spaces,
> including the fitness center, though options to purchase, rights of first
> refusal, leasing rights, etc.  As you may recall, we were concerned that
> if you sold the commercial units to anyone else, they could freely
> control the uses of such units, subject only to restrictions of record.
> Therefore, we wanted to make sure that the commercial units would
> be adequately protected.

(KOD CSOF Ex. 25.)  It is not entirely clear whether the "commercial spaces"

referred to include the units themselves or also the limited common elements.

26

In another email correspondence between Stone and Sloan dated June 26, 2007 regarding appurtenant parking stalls, Stone communicated his concern that KOD control the parking stalls.  (KOD CSOF Ex. 15.)  Sloan responded "I think they [the parking stalls] are attached to the commercial units so your concern may be a mute [sic] pont."  (Id.)

The Court finds that several reasonable inferences may be drawn from this evidence, particularly in light of the definitions of common elements provided by statute and by the contracts and declaration.  The communications can be interpreted to mean that Sloan was simply acknowledging KOD's ability to use whatever limited common elements might be attached at the time KOD purchases the units.  Or, Sloan might have been demonstrating his understanding of the parties' intent under the contract to keep the LCE with the Commercial Apartments and always transfer them together so that KOD might maintain control.

KOD further argues that draft letters of intent prepared between KOD affiliate Ko Olina Beach Villas Commercial LLC and Ritz-Carlton would have conveyed the LCE along with the Commercial Apartments, had those negotiations gone through.  (KOD First Mot. at 10.)  For instance, a draft August 2007 letter indicated that fee simple interest in the Commercial Apartments would have transferred "together with all of Assignor's interests in limited common elements

27

and common areas appurtenant to such commercial apartments."[11]  (KOD Mot. CSOF Ex. 17 at 1.)

Centex disputes that the Ritz-Carlton evidence demonstrates any understanding to assign the LCE to KOD.  (Centex First Opp'n at 13.)  First, all correspondence was merely regarding draft agreements that were never executed. Second, Centex counters by submitting a draft "Summary of Terms for Ritz Carlton Management at Beach Villas," which contemplates that KOD's existing rights would be extinguished.  (Centex CSOF Ex. I at 2.)  KOD would have agreed to "support the modification of the Beach Villas project documents required by Centex."[12]  (Id.)  Furthermore, the document explicitly states that Centex is obligated to "deed the commercial units and associated common elements to the AOAO upon transfer of all residential units to third party purchasers."  (Id. at 3.)

Finally, KOD dedicates a significant portion of its briefing in this First Motion, and elsewhere, to allegations that Centex's motive in recharacterizing the limited common elements as common elements is to appease a third party group of

---

[11] A hand-written note on the side reads "except out parking and storage." (KOD Mot. CSOF Ex. 17 at 1.)

[12] Which "project documents" would be modified is not clear, although examples in a parenthetical include public reports, budgets, and length of stay restrictions.

"disgruntled" apartment owners, the "Kanazawa Group."  (E.g., KOD First Mot. at 20-22.)  KOD asserts that Centex always knew that the LCE would be included, until Centex changed its position when faced with a lawsuit from the Kanazawa Group over control of the LCE.  This goes not only to intent, but to motive.

Upon review of the extrinsic evidence as a whole, the Court concludes that the evidence is reasonably susceptible to multiple interpretations.  The parties ask this Court to reach conclusions on various individuals' thought process, intent, motive, and credibility, and to weigh conflicting evidence.  This is not appropriate on a motion for summary judgment.  "'[C]redibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'"  Blankenhorn v. City of Orange, 485 F.3d 463, 470 (9th Cir. 2007) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)).  See also Conn v. City of Reno, 572 F.3d 1047, 1058 (9th Cir. 2009) ("We, of course, may not make credibility determinations or weigh conflicting evidence."); Porter v. Cal. Dep't of Corrections, 419 F.3d 885, 891 (9th Cir. 2005).

Accordingly, KOD's First Motion for Partial Summary Judgment is GRANTED IN PART AND DENIED IN PART WITHOUT PREJUDICE.  To the extent KOD moves this Court to declare that the Right of First Refusal is a binding agreement granting KOD the right to purchase "Commercial Apartments," that

29

request is GRANTED.   To the extent KOD moves the Court to declare that the

Commercial Apartments necessarily include the limited common elements based

on the terms of the Right of First Refusal and Amendments, that request is

DENIED WITHOUT PREJUDICE.   There are genuine issues of material fact as to

whether the "Commercial Apartments" necessarily included the limited common

elements.   KOD's request that the Court preclude Centex from severing the LCE

from Commercial Apartments on the basis of the Right of First Refusal and

Amendment is DENIED WITHOUT PREJUDICE.

III.    <u>Whether Covenant 3B Prevents Recharacterizing the Limited Common
        Elements Without KOD's Approval</u>

            Alternatively, KOD argues that under the plain language of the

restrictive covenants running with the property, Centex cannot recharacterize the

LCE without prior written approval of KOD.   Specifically, Covenant 3B of the

Declaration of Covenants filed on September 1, 2005 provides:

> When, as and if Declarant shall impose a condominium declaration
> against the Property . . . Declarant agrees that . . . neither the
> condominium declaration filed by Declarant nor the by-laws may be
> modified in any manner that <u>materially alters</u> (whether by addition,
> deletion or modification) <u>the uses</u> that may be made of the Property
> without the prior written approval of KOD.

(KOD Mot. CSOF Ex. 8 ¶ 3B (emphasis added).)   KOD argues that Centex was

aware that this language limited Centex's ability to recharacterize the limited

30

common elements as common elements, becuase converting them to common elements would alter the "use" of the property without prior consent by KOD. (KOD Sec. Mot. at 2.)  The Court concludes that recharacterizing the limited common elements as common elements does not materially alter the "use" of the Property as envisioned by the Declaration of Covenants, and Covenant 3B does not independently prohibit Centex from recharacterizing the LCE.

A.    "Uses" of the Property

According to KOD, Article XXIII of the Condominium Declaration allows Centex to recharacterize certain LCE as common elements without the approval of the apartment owners,[13] but not without the approval of KOD because Covenant 3B effectively trumps Article XXIII.  (Id. at 8.)  Effectuating Article XXIII without written consent would violate Covenant 3B. (Id. at 9)  KOD argues two alternative theories.  Either, one, the plain language of Covenant 3B prohibits Centex from recharacterizing the LCE without KOD's consent, or two, if the language is ambiguous, extrinsic evidence of Centex's communications with the Kanazawa Group demonstrates that Section 3B was intended to preclude unilateral recharacterization of the LCE.

---

[13] Centex may also amend the Condominium Declaration through a 75% vote of the apartment owners.  (KOD Sec. Mot. at 9.)

Under the Condominium Declaration, the LCE are designated as follows:

> Certain parts of the Common Elements, herein called the "Limited Common Elements," are hereby designated, set aside and reserved for the <u>exclusive use</u> of certain Apartments, and such Apartments shall have appurtenant thereto exclusive easements for the use of such Limited Common Elements as set forth herein. . . .

(Centex Opp'n CSOF Ex. K at 13 (emphasis added).)  CA-2 is granted an appurtenant easement to the recreational facilities, housekeeping areas, telephone system, parking stalls and related areas, and other designated areas.  (<u>Id.</u> at 13-14.)  CA-3 is granted an appurtenant easement as to a lanai area and the interior of the mailbox.  (<u>Id.</u> at 14.)  Owners also have the right to reserve "the exclusive use of certain portions of such [LCE] appurtenant to its Apartment, including, without limitation, pool side cabanas, to the Association or to a third party pursuant to any reserved right specified in Article XXXII herein or otherwise."  (<u>Id.</u> at 16.)

Article IID of the Condominium Declaration states that an "Owner of the Business Apartment [CA-2] may <u>build upon and/or change</u> any Limited Common Element which is appurtenant to the Business Apartment, may <u>change the use</u> of such [LCE], [and] <u>may lease</u> any such [LCE]."  (<u>Id.</u> at 13 (emphasis added).)  Accordingly, under Article IID of the Condominium Declaration, the owner may change the use of the LCE, and lease it out.

32

Article XXIII of the Condominium Declaration expressly reserves to

Centex the right to recharacterize the LCE.  This section, entitled "Reserved Right

to Recharacterize Limited Common Elements," provides:

> The Developer shall have the <u>reserved right</u>, but not the
> obligation, to amend this Declaration to <u>recharacterize certain Limited
> Common Elements as may be appurtenant to an Apartment owned by
> the Developer as being Common Elements of the Project</u>.
> The right to amend the Declaration to effect the
> recharacterization of any Limited Common Element appurtenant to an
> Apartment as Common Elements shall occur at any time or times prior
> to December 31, 2025, and Developer may, without being required to
> obtain the consent or joinder of any Owner, lienholder or other
> persons, execute, deliver and file any deed and/or amendments to this
> Declaration or to the Condominium Map, and any and all other
> instruments necessary or appropriate for the purpose of carrying out
> the provisions or exercising the foregoing rights, powers or privileges.

(Opp'n CSOF Ex. K at 44 (emphasis added).)  Article XXIII, therefore, expressly

grants Centex the right to recharacterize the LCEs and common elements.[14]

If the LCE is recharacterized as a common element, KOD is

concerned that it would be deprived of uses.  For instance, the owner of CA-2

might lose the ability to build pool side cabanas or to lease the LCE.  (KOD Sec.

Mot. at 19.)  KOD admits to approving Article XXIII, but states it did so "with the

---

[14] The Court is not persuaded by KOD's argument that the term "certain"
creates an ambiguity.  The term "certain" is followed by the phrase "as may be
appurtenant," which clarifies that the clause is referring to limited common
elements that are appurtenant to an Apartment.

understanding that Centex would not and could not exercise that power without

KOD's consent."  (Id. at 20 n.23.)

KOD's position is tenuous.  As this Court noted in its August 13,

2009 Order Denying Plaintiffs' Motion for Preliminary Injunction, conversion

from limited common element to common element affects who has access to the

LCE, not the uses or purposes to which the LCE are put.  (Aug. 13 Order at 16.)

Conversion to common element would not change the use of a mail alcove into a

parking stall.  (Id.)  Swimming pools and sidewalks would remain as they are,

regardless of whether controlled by KOD or the AOAO.  (Centex Sec. Opp'n at

25.)  KOD reiterates its concern that it have control over the LCE.  This may

indeed be KOD's primary concern; however, Covenant 3B pertains to the uses of

the property, not KOD's desire for control of various aspects of the property.

The Court also struggles to juxtapose KOD's arguments with the

documents presented.  KOD's primary argument that it might lose a use is derived

from rights granted in the Condominium Declaration itself.  Taking for example

the right to lease or build pool side cabanas, KOD points to no other document

granting KOD the right to lease or build cabanas on the LCE except for the

Condominium Declaration.  The Declaration of Covenants does not reserve to

KOD the right to lease or build cabanas, nor does the Right of First Refusal, the

PSA, or First and Second Amendments.  The right arises solely from the Condominium Declaration.  But Article XXIII of the very same document also allows Centex to recharacterize the limited common elements to common elements.  KOD is, in essence, asking the Court to enforce one Condominium Declaration term but not another because Article XXIII allegedly violates Covenant 3B.

The dispositive question to be resolved is whether the "use" at issue in the Declaration of Covenants is the same "use" at issue in the Condominium Declaration.  Upon review of the Declaration of Covenants recorded on September 1, 2005, the Court concludes that the term "use" therein did not encompass the type of "uses" presented in the March 7, 2007 Condominium Declaration, and KOD's argument fails.

In the Declaration of Covenants, the term "use" is not employed in the same way as the term "use" is employed in the Condominium Declaration. Covenant 1 describes the "use" restrictions in the Declamation of Covenants:

> (a) No portion of the Property shall be used for any <u>commercial or retail purposes</u> unless the same are (i) incidental to the residential uses of the Property (i.e., designed to serve only residents or guests thereof and not generally open to the public, or (ii) approved in writing by KOD. . . .

> (b) The Property shall be <u>used solely for a luxury condominium</u>, and no portion of the Property may be used for time-share, fractional ownership or any similar (e.g., "club") purpose.
> . . .

(KOD CSOF Ex. 8 at 2-3 (emphasis added).)  Pursuant to this quoted language, the "use" restrictions to which the parties agreed in the Declaration of Covenants concerned the commercial or retail versus residential nature of the Property as a whole.  The focus of their agreement was that the Property would be a luxury condominium, with any commercial or retail use merely incidental to the residential nature of the property.  This cannot reasonably be interpreted as limiting what parts of the property may be characterized as "common elements" versus "limited common elements," as is the focus of the Condominium Declaration.  The Court further rejects KOD's attempt to render the term "use" ambiguous, as it is employed in the Declaration of Covenants.  (KOD Sec. Reply at 6.)  It is quite clear that the parties were referring to the overall commercial versus residential nature of the Property when describing the "use" to which the Property would be put.

The Condominium Declaration grants owners the right to lease in Article IID, but then expressly reserves the right to recharacterize the LCE in Article XXIII.  An owner's rights that are created in Article IID are therefore

subject to the limitation in Article XXIII.  Covenant 3B is not an independent limitation on Article XXIII, because it necessarily refers to "uses" of the Property other than those which had been subsequently created by the Condominium Declaration.

Covenant 3B restricts Centex from modifying terms in a way that "materially alters . . . the uses that may be made of the Property" without KOD's consent.  The Court concludes that converting an area from a limited common element to a common element does not materially alter the "use" that may be made of the property.  In fact, a limited common area is simply a subtype of common element.  More unit owners may use the area once it is a common element; the type of use does not necessarily change.  If the parties wished to contract for who had exclusive <u>control</u> over the common elements, then the parties should have included an express term to that effect.

In this respect, KOD's Second Motion is premature, because as of yet there is no actual or foreseeable change in "use" of the property.  Were KOD to own the units, KOD would still have access to and use of the common elements.  Indeed, HRS § 514B-38 mandates that each unit owner use the common elements

in accordance with the rights of other unit owners to use the common elements.[15] Haw. Rev. Stat. § 514B-38(1).

Assuming the term "use" is ambiguous, KOD asks this Court to consider Centex's communications with the Kanazawa Group during settlement negotiations in a matter not before the Court.  Because the Court concludes that the terms are not ambiguous, the Court declines to review such evidence.

Accordingly, KOD's Second Motion is DENIED.

## IV.   KOD's Third Motion

KOD's Third Motion moves the Court to find that Centex and the Kanazawa Group are attempting to circumvent KOD's rights in the LCE and impose significant use restrictions which would effectively vest control of the areas in the AOAO.  (KOD Third Mot. at 1.)  This motion, however, presumes that the Court has granted KOD's motions as to KOD's rights in the LCE.  The Court has found genuine issues of facts as to whether the Right of First Refusal contractually awarded KOD the right to the LCE along with the Commercial Apartments. KOD's Third Motion is therefore premature and is DENIED WITHOUT PREJUDICE.

---

[15] This is stated likewise in HRS § 514A-13(c) (repealed July 1, 2006).

38

V.   Centex's Motion

In its own motion for summary judgment, Centex moves this Court to rule on several issues.  These include finding that:  (1) neither the Right of First Refusal, as amended, nor the Condominium Declaration give KOD rights to obtain the LCE appurtenant to Commercial Apartment No. 2 (CA-2); (2) the Condominium Declaration gives Centex the unilateral right to recharacterize the limited common elements into common elements; (3) Centex is not obligated to obtain approval from KOD prior to recharacterizing the elements, so long as Centex is the owner of CA-2 at the time of the recharacterization; (4) Centex may impose conditions on the offer to sell the Commercial Apartments when the Right of First Refusal is ultimately triggered; (5) Centex has the right to have the AOAO vote on the amendment to the Condominium Declamation to recharacterize the limited common elements; (6) Centex has the right to vote its interest in unsold units in any ballot proposal put forth by the AOAO; and (7) Centex is entitled to attorneys' fees and costs associated with the motion.

Upon review of Centex's motion and the supporting and opposing memoranda, Centex's motion is GRANTED IN PART AND DENIED IN PART WITHOUT PREJUDICE.  As to the Condominium Declaration and Covenant 3B, the Court has already found that Covenants 3B, alone, does not limit Centex's

ability to recharacterize the limited common elements as common elements.  The

briefing submitted in support of and in opposition to Centex's motion largely

mirrors the arguments already presented in supporting and opposing memoranda to

KOD's motions and does not alter this Court's conclusion.  Centex's motion is

GRANTED as to Covenant 3B.

   The Court has already found genuine issues of material fact as to

whether the Right of First Refusal, as amended, includes the limited common

elements.  The parties' briefing submitted in support of and in opposition to this

specific matter in Centex's motion largely repeats arguments made in supporting

and opposing memoranda to KOD's motions and reaffirms this Court's conclusion

that genuine issues of material facts exist.

   Whether the LCE are included in the Right of First Refusal is a

threshold issue in this case.  Ruling on the other matters presented in Centex's

motion before this issue is resolved would be premature.  Accordingly, Centex's

motion in all other respects is DENIED WITHOUT PREJUDICE.

<u>CONCLUSION</u>

   For the reasons stated above, the Court:  (1) GRANTS IN PART AND

DENIES IN PART WITHOUT PREJUDICE Centex's Motion for Summary

Judgment; (2) DENIES WITHOUT PREJUDICE KOD'S First Motion for Partial

Summary Judgment; (3) DENIES KOD'S Second Motion for Partial Summary

Judgment; and (4) DENIES WITHOUT PREJUDICE KOD'S Third Motion for

Partial Summary Judgment.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, June 8, 2010.

_____
David Alan Ezra
United States District Judge

Ko Olina Development, LLC v. Centex Homes, et al., Civ. No. 09-00272 DAE-
LEK; ORDER: (1) GRANTING IN PART AND DENYING IN PART WITHOUT
PREJUDICE CENTEX'S MOTION FOR SUMMARY JUDGMENT; (2)
DENYING WITHOUT PREJUDICE KOD'S FIRST MOTION FOR PARTIAL
SUMMARY JUDGMENT; (3) DENYING KOD'S SECOND MOTION FOR
PARTIAL SUMMARY JUDGMENT; AND (4) DENYING WITHOUT
PREJUDICE KOD'S THIRD MOTION FOR SUMMARY JUDGMENT

41